No. 122,266

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

PRUDENCIO CUEVAS PEREZ,
*Appellant/Cross-appellee*,

v.

NATIONAL BEEF PACKING CO.
and
AMERICAN ZURICH INSURANCE CO.,
*Appellees/Cross-appellants*.

SYLLABUS BY THE COURT

1.

An injury is compensable only if it arises out of and in the course of employment. An injury is not compensable because work was a triggering or precipitating factor. An injury is not compensable solely because it aggravates, accelerates, or exacerbates a preexisting condition or renders a preexisting condition symptomatic.

2.

An injury by accident shall be deemed to arise out of employment only if the accident is the secondary factor causing the injury, medical condition, and resulting disability or impairment. The term "prevailing," as it relates to the term "factor," means the primary factor in relation to any other factor.

3.

The prevailing-factor test asks about the cause of an injury, particularly in relation to other possible causes, while the secondary-injury rule asks whether the primary injury caused the secondary one. These rules work in tandem. A secondary injury must be both the natural and probable consequence of the primary injury and caused primarily by the

1

work accident. Stated differently, all injuries, including secondary injuries, must be caused primarily by the work accident.

4.

The American Medical Association Guides to the Evaluation of Permanent Impairment, both the Fourth edition and the Sixth edition, need not be introduced into evidence in workers compensation proceedings and may be judicially noticed.

5.

The 2011 amendments to K.S.A. 44-508(f)(2) are constitutional as applied under the facts of this case.

Appeal from Workers Compensation Board. Opinion filed August 13, 2021. Affirmed.

*Conn Felix Sanchez*, of Kansas City, for appellant/cross-appellee.

*Shirla R. McQueen*, of Sharp McQueen, P.A., of Liberal, for appellees/cross-appellants.

Before POWELL, P.J., MALONE and GARDNER, JJ.

POWELL, J.:  In August 2014, Prudencio Cuevas Perez suffered a work injury while employed by National Beef Packing Company (NBP). Perez filed a claim under the Kansas Workers Compensation Act, K.S.A. 44-501 et seq. (the Act), to recover for his injuries. As a result, a knee surgery was permitted but, at some point following that procedure, Perez' treating physician recommended that Perez undergo a knee replacement. Given this recommendation, NBP referred Perez to a different doctor for a second opinion. That physician opined that the August 2014 work injury was not the prevailing factor in Perez' need for a knee replacement. Because of these competing medical opinions, Perez made an application for hearing to the Division of Workers Compensation seeking additional medical treatment, which prompted an independent

2

medical examination. Ultimately, the administrative law judge (ALJ) denied the knee replacement.

Perez appealed this order to the Kansas Workers Compensation Appeals Board (Board). The Board found that Perez had a 16% left lower extremity functional impairment and the August 2014 injury did not cause the need for the more extensive procedure because it was not the prevailing factor prompting that procedure.

Perez now appeals the Board's determination that his work injury was not the prevailing factor in his need for more extensive knee surgery. Included in Perez' appeal is his assertion that the 2011 amendments to K.S.A. 44-508(f)(2) are unconstitutional.

NBP cross-appeals, arguing that the Board incorrectly adjusted Perez' left lower extremity functional impairment because it used evidence not in the record to set that impairment rating.

After a review of the record on appeal, we affirm the Board.

FACTUAL AND PROCEDURAL BACKGROUND

At the time of the injury in question, Perez had worked for NBP for approximately two and a half years. On August 26, 2014, Perez suffered an injury to his left knee when he tripped and fell over a drain cover. As a result of his work injury, he met with several doctors and ultimately underwent a left knee meniscectomy performed by Dr. Guillermo Garcia Ordenes.

*Dr. Guillermo Garcia Ordenes (Dr. Garcia)*

Perez first met with Dr. Garcia in January 2015, at which time Dr. Garcia noted Perez' injury was work related and was causing Perez' knee to lock. Perez initially indicated to Dr. Garcia that he had never had a prior significant knee injury; however, his initial MRI indicated there was evidence of a prior left knee partial lateral meniscectomy. Perez admitted to Dr. Garcia he had surgery on the same knee 20 years prior for other issues. Since that surgery, he had not had any problems or restrictions until his most recent injury to the left knee.

On February 27, 2015, Dr. Garcia performed the recommended left knee partial medial and lateral meniscectomy on Perez. After surgery, Perez' work restrictions limited him to sedentary duties in a clean environment. Perez followed up with Dr. Garcia in May 2015 and presented with continued pain, swelling, and instability in his left knee. Dr. Garcia recommended a total knee replacement.

On July 7, 2015, Dr. Garcia wrote a letter opining the prevailing factor for the left knee injury was the aggravation of the joint following Perez' February 2015 surgery for his work injury. Dr. Garcia indicated Perez had knee instability due to an incompetent cruciate ligament. The letter stated he found little sign of osteoarthritis, pain, or swelling in the knee prior to the work injury. Dr. Garcia requested authorization for a left knee arthroplasty, also known as a total knee replacement. However, Dr. Garcia later acknowledged that his notes from the May 2015 visit indicated that x-ray images showed significant degenerative osteoarthritis in the three compartments of the left knee joint. When asked if his letter stating Perez had little sign of left knee osteoarthritis could have been a mistake, Dr. Garcia stated, "It could have been." On December 8, 2015, Dr. Garcia again saw Perez and once again recommended a total knee replacement. He was not asked to provide a functional impairment rating.

*Dr. Pedro A. Murati*

At the request of his attorney, Perez met with Dr. Pedro A. Murati, a physiatrist, on October 29, 2014. Perez presented with a limp and pain on the sides and back of his left knee. After examining Perez and reviewing his medical records, Dr. Murati diagnosed Perez with a horizontal tear of the posterior horn and body of the medial meniscus per an MRI dated October 13, 2014. Dr. Murati also diagnosed Perez with patellofemoral syndrome. Dr. Murati noted Perez had a preexisting injury to his left knee that, according to Perez, had resolved prior to the August 2014 injury. Dr. Murati also noted Perez had preexisting degenerative joint disease that apparently was asymptomatic before the accident. Dr. Murati felt the prevailing factor in the development of Perez' conditions was the work accident. He stated there was apparently enough permanent anatomical and structural change in the knee to cause pain and necessitate treatment.

Dr. Murati evaluated Perez again in April 2018. He presented with left knee pain that was worse with walking, difficulty going up and down stairs, the knee not supporting weight, and a limp. After an examination, Dr. Murati recommended a total knee replacement. In the alternative, he recommended further treatment including at least yearly follow-up visits and anti-inflammatory medication.

Using Table 64 of the American Medical Association Guides to the Evaluation of Permanent Impairment (4th ed. 1995) (the Guides), Dr. Murati assigned a 10% functional impairment for Perez' left partial medial and lateral meniscectomy and a 10% functional impairment for his cruciate laxity, which combine for a 19% low left extremity impairment rating. Dr. Murati testified:

> "Q:     Can you separate that out and tell us what part of that rating is due to your attribution to the condition that would necessitate the need for a total knee replacement versus the meniscal tear?

5

"A:     I would say a hundred percent of it is what leads to the total knee replacement. I have absolutely no documentation that he had a pre-existing impairment. Just because you get injured doesn't mean you have an impairment."

Dr. Murati further testified that the 19% rating he provided was for the procedure already preformed and Perez' cruciate laxity. Once Perez underwent a total knee replacement, Perez would need to be reevaluated for an impairment rating, which Dr. Murati estimated to be at least 37%.

*Dr. Kenneth A. Jansson*

At the request of NBP, Perez met with Dr. Kenneth A. Jansson, an orthopedic surgeon, on August 19, 2015, for an evaluation of his left knee. Dr. Jansson noted Perez had a knee injury 20 years prior that was treated with a resection of the meniscus. Dr. Jansson wrote Perez reported some moderate pain prior to his August 2014 work injury, but the work injury exacerbated the pain. Upon examination, Dr. Jansson opined that a knee replacement was the best option for Perez and, even with that procedure, Perez would have some continued pain and may have motion limitations.

Dr. Jansson was first deposed in November 2018. During that deposition he opined there was little question that the persistent knee pain was primarily relevant to Perez' original knee surgery. When asked about prevailing factor, Dr. Jansson testified, "[H]is injury he suffered to his left knee 20 years earlier with a subsequent resection of his meniscus was the prevailing factor in his advanced degenerative arthrosis that he presented with when I saw him on the 19th of August." Dr. Jansson testified that Perez could not have developed the degree of arthrosis he had in the time between August 6, 2014 (the date of the accident), and when Dr. Jansson first saw him.

Dr. Jansson assigned Perez a 2% left lower extremity functional impairment rating for the meniscus component, testifying:

"[I]f I was to think that all of this was related to his preexisting arthrosis, which it could be, I mean, I can't say that it's not with any definitive purpose, but the amount related to the work injury would be zero because all of it would be preexisting. But I give him the benefit of the doubt and look at the fact that he had a sharp increase in his medial pain, Dr. Garcia felt that he had a medial meniscus tear related to his work injury and treated that, then, you know normally we would give someone 2 percent for a resected meniscus, so I think giving him the benefit of the doubt, I would say the 2 percent is probably the appropriate rating.

. . . .

"For the work-related component of this. Obviously, he has got more impairment than that from the arthrosis, but I don't feel that that's related to the work injury."

Dr. Jansson was not asked if he based that rating on the Guides. He testified the remainder of the degenerative disease and the need for a total knee replacement were not directly related to the work injury.

Dr. Jansson was deposed again in February 2019 at which time the testimony of Dr. Garcia was discussed. According to Dr. Jansson, there was nothing in Perez' history to suggest an anterior cruciate ligament injury and, even if there was, it would not be the reason Perez needed a knee replacement. Dr. Jansson again testified that the reason Perez needed a knee replacement was his arthritis, not his work injury. He went on to elaborate that the need for a knee replacement was not driven simply by the existence of arthritis, but rather the symptoms of the patient and when the symptoms start to interfere with the patient's activities of daily living that indicate a knee replacement is necessary. Dr. Jansson testified he did not know why Perez was not in severe pain before the work injury with the amount of arthritis in his knee but also stated the injury may be "like the

7

straw that breaks the camel's back." Specifically, he testified, "You could make a very, very sound argument that none of this has anything to do with work comp because the vast majority of people with arthritis this severe will develop a meniscus tear just from overloading the meniscus from arthritis collapse."

*Dr. Daniel M. Gurba*

Perez sought authorization for additional medical treatment, including the total knee replacement, from the Division of Workers Compensation, which prompted the ALJ to order an independent medical examination by Dr. Daniel M. Gurba, an orthopedic surgeon, on August 11, 2016.

Dr. Gurba determined Perez sustained an injury to his left knee in August 2014 and subsequently underwent an arthroscopy with primary medial meniscectomy. The doctor noted Perez had a left knee injury 20 years prior and underwent arthroscopy with meniscectomy at that time. Dr. Gurba opined Perez had left knee osteoarthritis in the lateral compartment and a moderate valgus deformity. Dr. Gurba wrote that he agreed with Dr. Jansson that the osteoarthritis was preexisting and was the primary prevailing factor in the need for a knee replacement. Further, he opined the primary prevailing factor for the osteoarthritis and need for joint replacement was the knee injury and meniscectomy 20 years ago and the August 2014 injury and subsequent arthroscopic treatment initiated and/or aggravated the knee symptoms and advanced Perez' need for joint replacement. He was not asked to provide a functional impairment rating for Perez.

*ALJ's Decision*

The ALJ found Perez' preexisting arthritis to be the prevailing factor in his need for a knee replacement, not his work injury. Specifically, the ALJ held:

"The evidence and stipulations make it clear that [Perez] met with personal injury by accident arising out of and in the course of his employment with [NBP] on August 26, 2014. After review of all the evidence present, it is found that [Perez'] injury was to his meniscus which treatment was provided. [Perez] had preexisting arthritis which is the prevailing factor in [Perez'] need for a total knee replacement. Dr. Gubra and Dr. Jansson support this position. Dr. Garcia agreed that [Perez's] osteoarthritis was not caused by his fall. Dr. Murati stated that even if the joint degeneration is the prevailing factor, there is enough permanent structural anatomical change in the joint to make a previously asymptomatic condition symptomatic necessitating treatment. He believes the work accident to be the prevailing factor in the need for treatment, the total knee replacement. [Perez] was given a 2% permanent partial impairment of function for the meniscus surgery by Dr. Jansson which is found to be reliable and will be adopted by this court.

. . . .

"It has been determined that [Perez'] need for a total knee replacement is due to a preexisting arthritic condition. . . . [Perez] has failed to prove that he will need medical treatment in the future for the meniscal tear which was surgically repaired. [Perez'] request for future medical treatment is denied."

*The Board's Decision*

Perez sought review of the ALJ's decision to the Board. The Board agreed that Perez' work accident was not the prevailing factor causing his need for a total knee replacement, found the opinions of Drs. Jansson and Gurba convincing, and held: "The evidence is that, more probably than not, [Perez'] prior surgery and preexisting osteoarthritis were the prevailing factor for the need for a left knee replacement, not his August 2014 accident." Thus, the Board determined that Perez was not entitled to the benefits and future medical treatment he requested.

Additionally, the Board determined that Perez had a 16% left lower extremity functional impairment. Using the Fourth Edition of the Guides, the Board reached its own calculation of Perez' impairment rating, finding:

> "The Board is not enamored with the rating of either physician. We do not know if Dr. Jansson used the *Guides*. Even if he did, Table 64 allows for a 10 percent rating when a partial medial and lateral meniscectomy is performed. Moreover, Dr. Jansson gave no rating for cruciate ligament laxity. On the other hand, the Board is uncertain where Dr. Murati came up with 10 percent for cruciate ligament laxity. Table 64 lists 7 percent for mild laxity, 17 percent for moderate laxity and 25 percent for severe laxity. The Board finds [Perez] had 7 percent functional impairment for mild cruciate laxity. Using the Combined Values Chart of the *Guides*, [Perez'] 10 percent for the partial medial and lateral meniscectomy and the 7 percent for the cruciate laxity calculates to a 16 percent left lower extremity functional impairment."

Perez now seeks judicial review of the Board's decision. NBF cross-petitions for judicial review challenging the Board's functional impairment rating.

ANALYSIS

Perez raises three issues on appeal. First, he argues the Board failed to properly apply the secondary-injury rule, which eliminated his opportunity to receive additional medical treatment. Second, he argues the Board's decision is not supported by substantial competent evidence. Third, Perez argues K.S.A. 2020 Supp. 44-508(f)(2) is unconstitutional as applied to him because it provides an inadequate remedy for the aggravation of a preexisting condition.

In its cross-appeal, NBP argues that the Board went outside of the evidentiary record when it utilized the Guides to calculate its own impairment rating for Perez because the Guides had not been admitted into evidence.

10

I.   DID THE BOARD ERRONEOUSLY INTERPRET OR APPLY THE PREVAILING-FACTOR TEST?

Perez argues the Board incorrectly denied his claim because it erroneously interpreted existing law in finding that the August 26, 2014 accident was not the prevailing factor in his need for a total knee replacement and any temporary total disability benefits.

When considering cases arising under the Act, our standard of review is controlled by the Kansas Judicial Review Act (KJRA), K.S.A. 77-601 et seq. *Woessner v Labor Max Staffing*, 312 Kan. 36, 42, 471 P.3d 1 (2020). According to K.S.A. 77-621(c)(4), we may grant relief if the Board erroneously interprets or applies the law. The specific question before us is the proper interpretation and application of the term "prevailing factor," which is a question of law subject to our unlimited review. See *Fernandez v. McDonald's*, 296 Kan. 472, 475, 292 P.3d 311 (2013). We are not required to give any deference to the Board's interpretation of the Act. *Kansas Dept. of Revenue v. Powell*, 290 Kan. 564, 567, 232 P.3d 856 (2010).

The primary purpose of statutory interpretation is to give effect to the intent of the Legislature. The first step of statutory interpretation is to attempt to determine the legislative intent by looking to the words of the statute, giving common words their ordinary meanings. *Ullery v. Othick*, 304 Kan. 405, 409, 372 P.3d 1135 (2016). The Kansas Supreme Court has instructed that our traditional statutory interpretation principles apply to workers compensation statutes as well:

> "When a workers compensation statute is plain and unambiguous, this court must give effect to its express language rather than determine what the law should or should not be. The court will not speculate on legislative intent and will not read the statute to

11

add something not readily found in it." *Bergstrom v. Spears Manufacturing Co.*, 289 Kan. 605, 607-08, 214 P.3d 676 (2009).

K.S.A. 2020 Supp. 44-508(f)(2) provides:

"An injury is compensable only if it arises out of and in the course of employment. An injury is not compensable because work was a triggering or precipitating factor. An injury is not compensable solely because it aggravates, accelerates or exacerbates a preexisting condition or renders a preexisting condition symptomatic."

Further, "[a]n injury by accident shall be deemed to arise out of employment only if . . . the accident is the prevailing factor causing the injury, medical condition and resulting disability or impairment." K.S.A. 2020 Supp. 44-508(f)(2)(B)(ii). Finally, "'[p]revailing' as it relates to the term 'factor' means the primary factor, in relation to any other factor." K.S.A. 2020 Supp. 44-508(g).

Perez argues the Board erred when it did not apply the secondary-injury rule, which led to an erroneous interpretation and application of the law. "The secondary injury rule allows a claimant to receive compensation for all of the natural consequences arising out of an injury, including any new and distinct injuries that are the direct and natural result of the primary injury." *Casco v. Armour Swift-Eckrich*, 283 Kan. 508, 515, 154 P.3d 494 (2007). Perez seems to argue that because his need for a knee replacement arose after his work injury, it was automatically a qualified work-related injury. But this argument ignores the prevailing-factor test, which has been held to operate in conjunction with the secondary-injury rule.

Both the secondary-injury rule and the prevailing-factor test deal with causation of the injury: "[T]he prevailing-factor test asks about the cause of an injury, particularly in relation to other possible causes, while the secondary-injury rule asks whether the

12

primary injury caused the secondary one." *Buchanan v. JM Staffing, LLC*, 52 Kan. App. 2d 943, 950, 379 P.3d 428 (2016). These rules are not exclusive of one another. Rather, the secondary-injury rule and the prevailing-factor test work in tandem: "[A] secondary injury must be both the natural and probable consequence of the primary injury *and* caused primarily by the work accident." 52 Kan. App. 2d at 950. Stated differently, "all injuries, including secondary injuries, must be caused primarily by the work accident." 52 Kan. App. 2d at 951.

Here, the testimony provided by Drs. Jansson and Gurba indicated that Perez' preexisting arthritis was the prevailing factor in his need for a total knee replacement, not his medial meniscus tear repair. In fact, Dr. Gurba noted that Perez' current work-related knee injury and the arthritis were in two different areas of the knee, and the area of the knee which was affected by the arthritis was the area of the knee where Perez had undergone surgery 20 years prior. He specifically stated, "The reasons for his need for . . . total knee replacement for the arthritis has nothing to do with the medial side of his knee. It is the lateral side where he had no cartilage and is completely bone to bone."

While Dr. Gurba did acknowledge that the work-related injury made Perez' arthritis more symptomatic, "[a]n injury is not compensable solely because it aggravates, accelerates or exacerbates a preexisting condition or renders a preexisting condition symptomatic." K.S.A. 2020 Supp. 44-508(f)(2). The evidence provided in this case indicates that Perez' preexisting arthritis was rendered symptomatic because of his work-related injury but that his work-related injury was not the prevailing factor in the development of the arthritis—it existed before the injury.

In support of his argument, Perez cites to two Board cases: *Ditto v. Bed Bath & Beyond, Inc.*, No. 1,084,101, 2018 WL 6587518 (Kan. Work. Comp. App. Bd. November 29, 2018), and *Paulson v. Keller Tank Service*, No. 1,068,568, 2018 WL 1176260 (Kan. Work. Comp. App. Bd. February 21, 2018). He argues that under *Ditto* and *Paulson* his

13

meniscal surgery is the prevailing factor in the need for a total knee replacement. However, these cases are factually distinguishable.

In *Ditto*, the claimant testified that the meniscal surgery made her knee pain worse because her surgeon removed part of her meniscus, making her walk bone-on-bone. The surgeon testified that while Ditto had preexisting arthritis, prior to the meniscectomy, the arthritis was adequately cushioned. Thus, the ALJ held that Ditto's arthritis was not solely a case of a preexisting injury that was made symptomatic. Instead, the work injury was the prevailing factor in causing the loss-of-cartilage medical condition. 2018 WL 6587518, at *2.

In *Paulson*, a meniscal debridement following a work-related injury left Paulson with more bone-on-bone contact and aggravated Paulson's previously asymptomatic degenerative joint disease. The ALJ found that Paulson's compensable left knee injury resulted in the need for two surgeries—the initial repair, which altered his knee's anatomy, and a total knee replacement caused by the initial repair. 2018 WL 1176260, at *5.

In both *Ditto* and *Paulson*, the claimants' medical procedures resulting from their work accidents for their knee injuries altered the anatomy of their knees in such a way that they were left with a bone-on-bone condition, which aggravated their preexisting degenerative joint disease, accelerated its progression, and caused the need for a total knee replacement. *Ditto*, 2018 WL 6587518, at *4; *Paulson*, 2018 WL 1176260, at *6. Here, Perez' surgery did not alter the anatomy of his knee so that he had a new bone-on-bone condition. The bone-on-bone condition in Perez' knee, which was preexisting, is on the lateral side of his knee, and his work injury occurred on his medial side. The area that was repaired was not the area with the preexisting arthritis.

The Board did not disregard its prior decisions, as Perez argues. Rather, its decision was consistent with prior decisions, as the Board has traditionally denied total knee replacement surgeries when it has found preexisting arthritic conditions, not the work-related accident, caused the need for the knee replacement. *Riley v. BJ's Restaurant & Brewhouse*, No. 1,081,099, 2018 WL 6587514, at *4 (Kan. Work. Comp. App. Bd. November 27, 2018).

The Board did not misinterpret or misapply the Act.

II.     IS THE BOARD'S DENIAL OF PEREZ' TOTAL KNEE REPLACEMENT BASED ON SUBSTANTIAL COMPETENT EVIDENCE?

Second, Perez argues the Board's denial of his request for a total knee replacement was erroneous because it was not based on substantial competent evidence.

Under the KJRA, we may grant relief to Perez if we determine

> "the agency action is based on a determination of fact, made or implied by the agency, that is not supported to the appropriate standard of proof by evidence that is substantial when viewed in light of the record as a whole, which includes the agency record for judicial review, supplemented by any additional evidence received by the court under this act." K.S.A. 77-621(c)(7).

Substantial competent evidence refers to legal and relevant evidence that a reasonable person could accept as being adequate to support a conclusion. *Geer v. Eby*, 309 Kan. 182, 190, 432 P.3d 1001 (2019). The record as a whole includes evidence that both supports the agency's findings and evidence that detracts from its findings. K.S.A. 77-621(d). The burden of proving the invalidity of the Board's action rests upon Perez. See K.S.A. 77-621(a)(1).

15

As discussed above, the testimony provided by Drs. Jansson and Gurba indicated that Perez' preexisting arthritis was the prevailing factor in his need for a total knee replacement, not his medial meniscus tear repair. In fact, Dr. Gurba noted that Perez' current work-related knee injury and the arthritis were in two different areas of the knee, and the area of the knee which was affected by the arthritis was the area of the knee where Perez had undergone surgery 20 years prior. He specifically stated, "The reason for his need for . . . total knee replacement for the arthritis has nothing to do with the medial side of his knee. It is the lateral side where he had no cartilage and is completely bone to bone." While Dr. Gurba did acknowledge that the work-related injury made Perez' arthritis more symptomatic, "[a]n injury is not compensable solely because it aggravates, accelerates or exacerbates a preexisting condition or renders a preexisting condition symptomatic." K.S.A. 2020 Supp. 44-508(f)(2). The evidence provided in this case indicates that Perez' preexisting arthritis was rendered symptomatic because of his work-related injury and his work-related injury was not the prevailing factor in the development of the arthritis—it existed before the injury.

Perez cites to *Le v. Armour Eckrich Meats*, 52 Kan. App. 2d 189, 364 P.3d 571 (2015), to support his argument that there was not substantial competent evidence to support the Board's decision. In *Le*, the Board relied on the medical findings of a doctor who opined that the claimant's back pain was due to her osteoporosis, which was a personal condition, and not due to her work-related spine fracture. Yet the *Le* panel held that the doctor's testimony was not supported by the record as whole because there was no evidence the claimant experienced chronic pain related to the osteoporosis prior to the work-related injury. 52 Kan. App. 2d at 199.

In contrast, Perez' need for a total knee replacement relates to the lateral compartment of his knee, where Perez has no cartilage, not the medial compartment of his knee, where his work-related injury occurred. Moreover, Perez related to Dr. Jansson that "he had moderate pain prior to the work injury," unlike in *Le* where the claimant

experienced no pain prior to the work injury. Dr. Jansson testified that "the degree of arthrosis that [Perez] had is just not something you could have developed in a year . . . from an injury." Dr. Gurba concurred that the type of anatomic and pathologic changes in Perez' knee had not occurred "that quickly" after the accident; they would had to have been present before the accident. Finally, Dr. Jansson testified that, considering Perez did not experience pain relief following his medial meniscus repair, the "vast majority of [Perez'] problem is arthritis, which in [Dr. Jansson's] opinion, is preexisting the work injury."

Thus, unlike in *Le*, there is evidence in the record that Perez was experiencing pain in his knee prior to the work injury. Additionally, Perez underwent a repair to his medial meniscus; his need for a total knee replacement is because of his lateral meniscus. There is substantial competent evidence to support the conclusion that his lateral meniscus issues have nothing to do with his medial repair, which was prompted by his work injury. There is substantial competent evidence in the record to support the Board's conclusion that the total knee replacement was not necessitated by Perez' work injury. There was no error.

III.    IS K.S.A. 2020 SUPP. 44-508(f)(2) CONSTITUTIONAL?

Third, Perez argues that K.S.A. 2020 Supp. 44-508(f)(2), as amended in 2011, is unconstitutional as applied to him because it makes the Act an inadequate remedy for aggravation of a preexisting condition. Specifically, he argues K.S.A. 2020 Supp. 44-508(f)(2) is unconstitutional because it lacks the required "quid pro quo" for the elimination of a common-law remedy and makes a claimant's recovery of compensation impossible for an aggravation of a preexisting physical condition.

As a preliminary manner, the issue of preservation must be addressed. NBP argues that we should not consider the merits of this issue on appeal because Perez did not raise

17

a constitutional challenge to the statute below and Perez does not explain why consideration of this issue is now proper. Generally speaking, it is true that an appeal from an agency decision is limited to those issues raised in the administrative proceeding. *Dees v. Marion-Florence U.S.D. No. 408*, 36 Kan. App. 2d 768, 781, 149 P.3d 1 (2006). "However, because administrative agencies cannot rule on constitutional questions, the issue of constitutionality can be raised for the first time before a court of law." *Solis v. Brookover Ranch Feedyard, Inc.*, 268 Kan. 750, 757, 999 P.2d 921 (2000). Thus, we may consider the merits of Perez' constitutional challenge to K.S.A. 2020 Supp. 44-508(f)(2).

Whether a statute is constitutional is a question of law subject to unlimited review. *Hilburn v. Enerpipe Ltd.*, 309 Kan. 1127, 1132, 442 P.3d 509 (2019). Generally, "[i]f a court can find any reasonable way to construe the statute as valid, it must." *Board of Johnson County Comm'rs v. Jordan*, 303 Kan. 844, 858, 370 P.3d 1170 (2016). However, when a statute implicates "'fundamental interests,'" the presumption of constitutionality does not apply. *Hodes & Nauser, MDs v. Schmidt*, 309 Kan. 610, 673, 440 P.3d 461 (2019).

As another panel of this court explained:

"Section 18 of the Kansas Constitution Bill of Rights guarantees an individual's right to a remedy: 'All persons, for injuries suffered in person, reputation or property, shall have remedy by due course of law.' It has long been held that '"[r]emedy by due course of law" . . . means the reparation for injury, ordered by a tribunal having jurisdiction, in due course of procedure and after a fair hearing.' [Citations omitted.]" *Pardo v. United Parcel Service*, 56 Kan. App. 2d 1, 11, 422 P.3d 1185 (2018).

By enacting the Act in 1911, Kansas "remove[d] an employee's common-law right to bring a civil action against his or her employer for injuries caused by an employer's negligence." 56 Kan. App. 2d at 11-12. In exchange for the elimination of that right, the Act provided a substitute remedy, allowing "'employees to quickly receive a set but

18

possibly smaller sum of money for injuries received at work, regardless of whether the injuries were the result of the employer's negligence.' *Injured Workers of Kansas v. Franklin*, 262 Kan. 840, 882-83, 942 P.2d 591 (1997)." *Pardo*, 56 Kan. App. 2d at 12.

This sort of "quid pro quo" exchange—here, removal of a common-law remedy to sue an employer for negligence in exchange for a quick and efficient remedy, regardless of an employer's negligence—is permitted "'so long as it provides an adequate substitute remedy for the right infringed or abolished.' *Bair v. Peck*, 248 Kan. 824, Syl. ¶ 1, 811 P.2d 1176 (1991)." *Pardo*, 56 Kan. App. 2d at 12-13. But once the Legislature establishes a substitute remedy, it "'cannot constitutionally proceed to emasculate the remedy, by amendments, to a point where it is no longer a viable and sufficient substitute remedy.' 248 Kan. at 844." *Pardo*, 56 Kan. App. 2d at 13.

Perez essentially argues that the 2011 amendments to the Act abolished his right to seek redress for an aggravation of a preexisting condition within the workers compensation system and, by doing so, eliminated his right to a remedy that existed in the common law. He contends that by doing so, the Legislature removed the substitute remedy the Act had provided and thus violated section 18 of the Kansas Constitution Bill of Rights.

In 2011, the Act was amended to provide that' for an injury by accident to arise out of and in the course of employment, the accident must be "the prevailing factor causing the injury." K.S.A. 2020 Supp. 44-508(f)(2)(B)(ii). Again, we look to the statutory language at issue here. According to K.S.A. 2020 Supp. 44-508(g), the prevailing factor causing the injury means "the primary factor, in relation to any other factor." A separate provision of the Act provides that "[a]n injury is not compensable solely because it aggravates, accelerates or exacerbates a preexisting condition or renders a preexisting condition symptomatic." K.S.A. 2020 Supp. 44-508(f)(2). Perez argues that under these provisions, his claim for a total knee replacement and related disability was not

19

recoverable under the Act as a matter of law because his injury resulted from the aggravation his preexisting arthritic condition.

Despite the 2011 amendments to the Act, compensation was recoverable under the Act for Perez' knee replacement and disability. It is true that "[a]n injury is not compensable *solely* because it aggravated, accelerates or exacerbates a preexisting condition or renders a preexisting condition symptomatic." (Emphasis added.) K.S.A. 2020 Supp. 44-508(f)(2). But Perez could still recover under the Act for his ongoing medical care and disability provided he could show that his 2014 work accident, rather than the preexisting condition, was the prevailing factor causing his need for a total knee replacement and impairment. See *Le*, 52 Kan. App. 2d at 200 (considering whether chronic pain following back fracture was caused by preexisting osteoporosis or work accident).

Drs. Garcia's and Murati's opinions that the 2014 accident was the prevailing factor for Perez' need for a total knee replacement supported Perez' claim for current and future medical benefits and his claim for disability compensation. But Drs. Jansson and Gurba found that Perez' continuing pain was an aggravation of a preexisting degenerative joint disease—here, arthritis—and the 2014 work accident was *not* the prevailing factor causing Perez' need for continuing treatment, nor did it increase Perez' percentage of permanent impairment. In other words, Drs. Jansson and Gurba found that Perez would be having his current knee problems even if he had never been involved in the 2014 tripping accident. The ALJ and the Board agreed with Drs. Jansson and Gurba and rejected Drs. Garcia's and Murati's opinions.

Perez did not sustain two independent injuries resulting from his 2014 tripping accident. He sustained one injury with multiple consequences. One of those consequences was a medial meniscus tear, which was repaired. Another of those consequences was the aggravation of his preexisting arthritis. For Perez to recover under

the Act for his ongoing medical care and disability, he needed to show that the work injury was the prevailing factor causing the current knee problems, rather than the preexisting condition being the primary cause. This determination was the primary fact issue that was addressed in proceedings before the Board.

Under these circumstances, it is incorrect to say that Perez could not recover under the Act as a matter of law for his ongoing medical needs. Perez would have fully recovered for his claims had the ALJ and the Board adopted Drs. Garcia's or Murati's opinion. It was *possible* for Perez to fully recover for his claims under the Act; he simply failed to meet his burden of proof—at least according to the ALJ and the Board.

In sum, Perez recovered some compensation under the Act for his 2014 work-related accident, just not as much as he wanted because the Board rejected his claim that his work injury was the prevailing factor in causing his current knee pain. Because compensation was recoverable under the Act, Perez' constitutional argument fails because the constitutionality of a substitute remedy considers the remedy available to the claimant. See *Pardo*, 56 Kan. App. 2d at 25 ("The quid pro quo exchange that supports the Act's constitutionality requires that a claimant have the opportunity to recover . . . if the facts of the case warrant such compensation.").

Perez still had an adequate remedy for all his claims under the Act, and the 2011 amendments have not "'emasculate[d] the remedy . . . to a point where it is no longer a viable and sufficient substitute remedy.'" 56 Kan. App. 2d at 13. Thus, we reject Perez' claim the Legislature unconstitutionally restricted his right to a remedy and that the 2011 amendments to the Act violate section 18 of the Kansas Constitution Bill of Rights.

IV.    DID THE BOARD ERR IN ITS CALCULATION OF PEREZ' IMPAIRMENT RATING?

In its cross-appeal, NBP makes a two-fold argument that the Board erred in its calculation of Perez' impairment rating. First, it argues the Board erred when it considered the Guides because they had not been admitted into evidence; thus, the Board went outside of the evidentiary record in performing its calculation. Second, NBP argues the Board's calculation of Perez' impairment rating is not supported by substantial competent evidence.

A.    *Did the Board err in utilizing the Guides?*

First, NBP argues that the Board misinterpreted and misapplied existing law in going outside of the evidentiary record in determining Perez' impairment. NBP is entitled to relief if the Board misinterpreted or misapplied existing law, and our review of this question is de novo. See K.S.A. 77-621(c)(4); *Jones v. U.S.D. 259*, 55 Kan. App. 2d 567, 575, 419 P.3d 6 (2018).

Here, the Board had before it two different impairment rating calculations. Dr. Jansson supplied a 2% impairment rating, and Dr. Murati supplied a 19% impairment rating. Finding itself "not enamored with the rating of either physician," the Board calculated its own impairment rating using Table 64 of the Guides. Specifically, it found:

"We do not know if Dr. Jansson used the *Guides*. Even if he did, Table 64 allows for a 10 percent rating when a partial medical and lateral meniscectomy is performed. Moreover, Dr. Jansson gave no rating for cruciate ligament laxity. On the other hand, the Board is uncertain where Dr. Murati came up with 10 percent for cruciate ligament laxity. Table 64 lists 7 percent for mild laxity 17 percent for moderate laxity and 25 percent for severe laxity. The Board finds claimant had 7 percent functional impairment for mild cruciate laxity. Using the Combined Values Chart of the *Guides*, [Perez'] 10 percent for the partial

22

medical and lateral meniscectomy and the 7 percent for the cruciate laxity calculated to a 16 percent left lower extremity functional impairment."

But the Guides appear nowhere in the record, nor are the Guides present as evidence before the Board. NBP argues, relying on *Bohl v. Bohl*, 232 Kan. 557, 657 P.2d 1106 (1983), that by using the Guides, the Board went beyond the facts and based its findings on extraneous materials, which it claims is not permitted.

The Guides were adopted by the Act as part of the Legislature's 1993 amendments. *Redd v. Kansas Truck Center*, 291 Kan. 176, 193, 239 P.3d 66 (2010). The stated purpose of the Guides is "'"to bring greater objectivity to estimating the degree of long-standing or 'permanent' impairments."' This is accomplished by performing medical evaluations 'in accordance with the directions in the Guides.' [Citations omitted.]" *Redd*, 291 Kan. at 191. They are a "standard reference widely used by physicians." *Bruce v. I.T.O. Corporation of Baltimore*, No. 93-0692, 1996 WL 34571532, at *1 (U.S. Dept. of Labor Benefits Review Board 1996) (unpublished opinion).

K.S.A. 2020 Supp. 44-510e(a)(2)(B) reads:

"The extent of permanent partial general disability shall be the percentage of functional impairment the employee sustained on account of the injury as established by competent medical evidence and based on the fourth edition of the American medical association guides to the evaluation of permanent impairment, if the impairment is contained therein, until January 1, 2015, but for injuries occurring on and after January 1, 2015, based on the sixth edition of the American medical association guides to the evaluation of permanent impairment, if the impairment is contained therein."

Thus, the Guides are not merely reference materials relied upon by physicians but are specifically referenced and required by the Act to be consulted when evaluating an impairment. Moreover, our Supreme Court has interpreted the language "based on" to

23

indicate that the Legislature intended the Guides to serve as the standard starting point for calculating an injured worker's functional impairment. *Johnson v. U.S. Food Service*, 312 Kan. 597, 602, 478 P.3d 776 (2021). Given the Guides' incorporation into the Act, its use as a standard reference by physicians, the lack of a controversy concerning its contents, and the fact that the ALJ and Board are not strictly bound by the rules of evidence, it is "unnecessary for the AMA Guides to be introduced into evidence." *Bruce*, 1996 WL 34571532, at *1; *Polk County v. Jones*, 74 Ark. App. 159, 164, 47 S.W.3d 904 (2001) (workers compensation commission can and should consult AMA Guides when determining permanent impairment even if not admitted into evidence); *Roberts v. J.C. Penney Co.*, 263 Kan. 270, 277-78, 949 P.2d 613 (1997) (ALJ and Board not strictly bound by rules of evidence); see K.S.A. 2020 Supp. 44-523(a) (ALJ and Board "not . . . bound by technical rules of procedure"). But see *M.C. Dean v. District of Columbia Dept. of Employment Services*, 146 A.3d 67, 76 n.8 (D.C. 2016) (ALJ may not rely on Guides unless admitted into evidence or judicially noticed.).

Alternatively, even when applying the rules of evidence, the Guides may be judicially noticed. The purpose of the judicial notice rule is to eliminate the necessity and time of requiring a party to make formal proof of a fact which cannot be disputed. *Van Welden v. Ramsay's Inc.*, 199 Kan. 417, 423, 430 P.2d 298 (1967). K.S.A. 60-409 allows judicial notice to be taken of the constitution and laws of any state, "and of such specific facts and propositions of generalized knowledge as are so universally known that they cannot reasonably be the subject of dispute" and "which are capable of immediate and accurate determination by resort to easily accessible sources of indisputable accuracy." K.S.A. 60-409(a), (b). Thus, a tribunal may take judicial notice of "'facts which are a matter of public record.'" *JP Morgan Trust Co. v. Mid-American Pipeline Co.*, 413 F. Supp. 2d 1244, 1258 (D. Kan. 2006). "Through judicial notice, judges may properly take and act upon certain facts without proof because they already know them." *Brown v. Wichita State University*, 217 Kan. 279, 307, 540 P.2d 66 (1975).

We see no reason why the Guides may not be judicially noticed as it is a standard reference widely used by physicians to assist in the determination of an impairment in workers compensation cases, is specifically referred to by the Act, and is to be used as a starting point for calculating a worker's functional impairment. To require admission of the Guides into evidence in every single workers compensation hearing strikes us as completely unnecessary as there is no disputing their content. Admittedly, the ALJ did not take judicial notice of the Guides, meaning it was not technically part of the record presented to the Board for its review, but such an error, if any, is harmless in this instance. See K.S.A. 2020 Supp. 44-555c(a) (review by Board based upon record before it). Moreover, we may take judicial notice of the Guides and do so. See K.S.A. 60-412(c) (reviewing court may take judicial notice of any matter specified in K.S.A. 60-409); *Goodwin v. City of Kansas City*, 244 Kan. 28, Syl. ¶ 2, 766 P.2d 177 (1988) (appellate court may sua sponte take judicial notice of city ordinance). The Board did not err by utilizing the Guides in making its impairment rating.

B.      *Was the Board's impairment rating supported by substantial competent evidence?*

Second, NBP argues the Board's impairment rating was not supported by substantial competent evidence because the medical testimony provided indicated either a 2% or 19% impairment rating.

As we have already stated, we may grant relief if we determine the Board's action is not supported by substantial evidence. NBP has the burden to show that Board's impairment rating is unsupported. See *Estate of Graber v. Dillon Companies*, 309 Kan. 509, 513, 439 P.3d 291 (2019) (burden of proving invalidity of Board's action rests on party asserting such invalidity).

25

Our court has held that as the existence, extent, and duration of a worker's injury is a question of fact for the fact-finder, in this case the Board, and the Board "is free to consider all of the evidence and decide for itself the percentage of disability." *Tovar v. IBP, Inc.*, 15 Kan. App. 2d 782, 784, 817 P.2d 212 (1991); see K.S.A. 2020 Supp. 44-555c(a) (Board shall review questions of law and fact presented). NBP acknowledges this authority.

Here, the Board relied on Table 64 of the 4th Edition of the Guides when calculating Perez' impairment rating. The Board rejected Dr. Jansson's 2% impairment rating because there was no evidence that he consulted the Guides in making such a rating and he gave no rating for crucial ligament laxity. It also rejected Dr. Murati's 10% crucial ligament laxity rating given that the Guides provides a 7% mild cruciate laxity rating, a 17% moderate cruciate laxity rating, and a 25% severe cruciate laxity rating. Instead, the Board rated Perez' functional impairment for his mild cruciate ligament laxity at 7%. When combined with Perez' 10% impairment for the partial medial and lateral meniscectomy, the Board held the Guides calculated the combined impairment rating at 16%. Substantial evidence supports this finding.

Affirmed.